**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SPENCER HELLWIG,

                           Plaintiff,                  1:22-cv-488 (BKS/DJS)

v.

COUNTY OF SARATOGA, SARATOGA COUNTY
BOARD OF SUPERVISORS, and THEODORE T.
KUSNIERZ, JR., individually and in his official capacity
as Chairman of the Saratoga County Board of Supervisors,

                           Defendants.

**Appearances:**

*For Plaintiff:*
Benjamin W. Hill
Abby K. McCormick-Foley
Capezza Hill, LLP
30 South Pearl Street – Suite P-110
Albany, NY 12207

*For Defendants County of Saratoga and Saratoga County Board of Supervisors:*
Timothy J. Lambrecht
Wladis Law Firm, P.C.
P.O. Box 245
Syracuse, NY 13214

*For Defendant Theodore T. Kusnierz, Jr.:*
William J. Dreyer
Stacy Mix
Dreyer Boyajian LLP
75 Columbia Street
Albany, NY 12210

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Spencer Hellwig brings this action against Defendants County of Saratoga (the "County"), County Board of Supervisors (the "County Board" and, together with the County, the "County Defendants"), and Theodore T. Kusnierz, Jr. ("Mr. Kusnierz"), alleging claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; the New York State Executive Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; and 42 U.S.C. § 1983. (Dkt. No. 1). Plaintiff alleges: (1) Title VII claims against the County Defendants for retaliation (First Cause of Action); (2) NYSHRL claims against the County Defendants for retaliation (Second Cause of Action); (3) a § 1983 claim against Defendant Mr. Kusnierz for retaliation (Third Cause of Action); and (4) an NYSHRL claim against Defendant Mr. Kusnierz for aiding and abetting (Fourth Cause of Action). (*Id.*). On January 26, 2024, the County Defendants filed a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 26). Defendant Mr. Kusnierz filed a separate motion for summary judgment that same day. (Dkt. No. 27). Plaintiff opposes both motions. (Dkt. Nos. 31–32). For the following reasons, Defendants' motions for summary judgment are denied.

## II.     FACTS[1]

### A.      The Parties

The County is a county organized and existing under the laws of the State of New York. (Dkt. No. 33, ¶ 6; Dkt. No. 38, ¶ 6; Dkt. No. 40, ¶ 6). The County Board is the legislative and

---

[1] The facts are drawn from the County Defendants' statement of material facts, (Dkt. No. 26-22), Defendant Mr. Kusnierz's statement of material facts, (Dkt. No. 27-3), Plaintiff's responses to Defendants' statements of material facts, (Dkt. Nos. 34–35), Plaintiff's statement of additional material facts, (Dkt. No. 33), and Defendants' responses to Plaintiff's statement of additional material facts, (Dkt. Nos. 38, 40), to the extent the facts are well-supported by

2

executive authority of the County government and oversees most County departments and programs. (Dkt. No. 26-22, ¶ 7; Dkt. No. 34, ¶ 7). The County Board supervises the official conduct of County officers and employees, controls all County property, enacts ordinances, sets salaries, conducts public meetings, and generally oversees County operations and business. (Dkt. No. 26-22, ¶ 7; Dkt. No. 34, ¶ 7).

The County Board is comprised of twenty-three Supervisors representing the nineteen towns and two cities within the County, (Dkt. No. 33, ¶ 7; Dkt. No. 38, ¶ 7; Dkt. No. 40, ¶ 7), and is governed by a Chairman elected by the Supervisors at the beginning of each year, (Dkt. No. 26-22, ¶ 8; Dkt. No. 34, ¶ 8). The vote of each Supervisor is accorded a weight in proportion to the population of the city or town he or she represents. (Dkt. No. 26-22, ¶ 6; Dkt. No. 34, ¶ 6).

The County Board makes personnel decisions when required by law. (Dkt. No. 26-22, ¶ 9; Dkt. No. 34, ¶ 9). There are twenty-five County positions appointed by the County Board. (Dkt. No. 26-22, ¶ 9; Dkt. No. 34, ¶ 9). The employees in these positions serve at the pleasure of the County Board. (Dkt. No. 26-22, ¶ 10; Dkt. No. 34, ¶ 10). The County Administrator position is a County Board appointed position under County Local Law 7-1979, which states: "The County Administrator shall be appointed by the [County Board] and shall serve at the pleasure of the [County Board]." (Dkt. No. 26-22, ¶ 11; Dkt. No. 34, ¶ 11; Dkt. No. 26-6, at 2).

Defendant Mr. Kusnierz was a member of the County Board and Supervisor for the Town of Moreau from January 1, 2018, until December 31, 2023. (Dkt. No. 26-22, ¶ 3; Dkt. No. 34, ¶ 3). He was elected Chairman of the County Board on January 6, 2021, and served in that role until December 31, 2023. (Dkt. No. 26-22, ¶ 3; Dkt. No. 34, ¶ 3).

---

pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Plaintiff was hired by the County in 1988. (Dkt. No. 33, ¶¶ 1–2; Dkt. No. 38, ¶¶ 1–2; Dkt. No. 40, ¶¶ 1–2). He was appointed County Administrator by the County Board on December 21, 2010, and served in that position until January 10, 2021. (Dkt. No. 26-22, ¶ 4; Dkt. No. 34, ¶ 4).

### B. The BSK Investigation

Margaret McNamara is the County's former Human Resources Director. (Dkt. No. 26-22, ¶ 17; Dkt. No. 34, ¶ 17). She had had a close professional relationship with Plaintiff. (Dkt. No. 33, ¶ 31; Dkt. No. 38, ¶ 31; Dkt. No. 40, ¶ 31).

On March 26, 2020, Ms. McNamara emailed the County Board "to request that any Human Resource related requests by [Defendant Mr.] Kusnierz be addressed through the County Administrator, the County Chair, or the County Attorney." (Dkt. No. 30-11, at 6). Ms. McNamara's email continues, "I have never made a request like this during my professional career," but "[Defendant Mr.] Kusnierz has been extremely offensive and retaliatory during our recent conversations." (*Id.*). The following day, Defendant Mr. Kusnierz cornered Plaintiff in a hallway at the County Administration Building and told him that he wanted an apology for Ms. McNamara's email. (Dkt. No. 33, ¶ 17; Dkt. No. 38, ¶ 17; Dkt. No. 40, ¶ 17). Plaintiff testified at his August 23, 2023 deposition that Defendant Mr. Kusnierz "told me she better apologize or this wasn't going to go away." (Dkt. No. 30-8, at 33:6–8).

On April 28, 2020, Ms. McNamara filed a formal complaint with the Saratoga County Attorney's Office, alleging sexual harassment by Defendant Mr. Kusnierz in violation of the County's Unlawful Workplace Harassment Policy. (Dkt. No. 26-22, ¶ 18; Dkt. No. 34, ¶ 18). Plaintiff encouraged Ms. McNamara to file the complaint and is listed in the complaint as a witness. (Dkt. No. 33, ¶¶ 22, 24; Dkt. No. 38, ¶¶ 22, 24; Dkt. No. 40, ¶¶ 22, 24).

The County Attorney, Stephen Dorsey, hired the law firm Bond, Schoeneck & King PLLC ("BSK") to conduct a confidential investigation into the McNamara complaint (the "BSK

Investigation"). (Dkt. No. 26-22, ¶ 19; Dkt. No. 34, ¶ 19). Mr. Dorsey testified at his August 8, 2023 deposition that while it was his decision to hire BSK, he needed "minor contract" approval. (Dkt. No. 30-19, at 40:16–41:11). Plaintiff, as County Administrator, approved the minor contract to hire BSK to conduct the BSK Investigation. (Dkt. No. 30, ¶ 27; Dkt. No. 38, ¶ 27; Dkt. No. 40, ¶ 27). Plaintiff did not approve Defendant Mr. Kusnierz's request for the County to pay the legal fees he incurred as a result of the McNamara complaint, (Dkt. No. 30, ¶¶ 28–29; Dkt. No. 38, ¶¶ 28–29; Dkt. No. 40, ¶¶ 28–29), stating in his February 28, 2024 declaration that it would have been "an inappropriate use of County/taxpayer funds," (Dkt. No. 36, ¶ 5).

The BSK Investigation began in May 2020. (Dkt. No. 33, ¶ 37; Dkt. No. 38, ¶ 37; Dkt. No. 40, ¶ 37). Defendant Mr. Kusnierz was interviewed on June 3, 2020, and Plaintiff was interviewed on June 15, 2020. (Dkt. No. 26-22, ¶¶ 20–21; Dkt. No. 34, ¶¶ 20–21). During his interview, Plaintiff stated that Defendant Mr. Kusnierz discriminated against Ms. McNamara based on her gender. (Dkt. No. 33, ¶ 41; Dkt. No. 38, ¶ 41; Dkt. No. 40, ¶ 41; *see also* Dkt. No. 27-2, at 18 ("[Plaintiff] said that there was no question that [Defendant Mr.] Kusnierz was acting this way toward [Ms. McNamara] because she is a woman.")).

On August 28, 2020, BSK issued a confidential report (the "BSK Report") documenting its findings. (Dkt. No. 26-22, ¶ 22; Dkt. No. 34, ¶ 22; Dkt. No. 27-2). The BSK Report concludes:

> Overall, while some of [Defendant Mr. Kusnierz]'s conduct is direct, and even borderline unprofessional (e.g., asking for [Ms. McNamara]'s resignation), there is very little evidence to support that he engaged in this way because of [Ms. McNamara]'s sex. As a result, the Investigator concludes that [Defendant Mr. Kusnierz] did not violate the County's Harassment Policy by engaging in sexual harassment of [Ms. McNamara].

(Dkt. No. 26-22, ¶ 24; Dkt. No. 34, ¶ 24; Dkt. No. 27-2, at 30).

5

Defendant Mr. Kusnierz received a copy of the BSK Report, which includes a summary of Plaintiff's interview with BSK. (Dkt. No. 33, ¶ 40; Dkt. No. 38, ¶ 40; Dkt. No. 40, ¶ 40). Individuals other than those who were provided a copy of the BSK Report were aware of the BSK Investigation, (Dkt. No. 33, ¶ 42; Dkt. No. 38, ¶ 42; Dkt. No. 40, ¶ 42), and knew that Plaintiff was supporting Ms. McNamara in her complaint against Defendant Mr. Kusnierz, (Dkt. No. 33, ¶ 43; Dkt. No. 38, ¶ 43; Dkt. No. 40, ¶ 43), although County Defendants have submitted affidavits from certain Supervisors who state that at the time they were unaware of Plaintiff's participation in the BSK Investigation, (*see, e.g.*, Dkt. No. 26-4, ¶¶ 23–25 (Phil Barrett, Supervisor for the Town of Clifton Park, stating, "I did not know it at the time . . . that [Plaintiff] was interviewed for this investigation.")).

### C.     The Jones Hacker Investigation

In March 2020, at the start of the COVID-19 pandemic, the County temporarily paid essential employees time-and-a-half for physically showing up at work. (Dkt. No. 26-22, ¶ 25; Dkt. No. 34, ¶ 25). The time-and-a-half plan and the circumstances of its implementation were the subject of public criticism and referred to as the "Pandemic Pay Scandal." (Dkt. No. 26-22, ¶ 27; Dkt. No. 34, ¶ 27).

In April 2020, the County Board retained the law firm E. Stewart Jones Hacker Murphy LLP ("Jones Hacker") to investigate how and why the time-and-a-half plan came to be (the "Jones Hacker Investigation"). (Dkt. No. 26-22, ¶ 28; Dkt. No. 34, ¶ 28). Plaintiff was interviewed twice as part of the Jones Hacker Investigation, on April 29 and July 1, 2020. (Dkt. No. 26-22, ¶ 30; Dkt. No. 34, ¶ 30).

Jones Hacker issued a report (the "Jones Hacker Report") to the County Board on August 6, 2020, (Dkt. No. 26-22, ¶ 30; Dkt. No. 34, ¶ 30), which appears to have been amended on October 1, 2020, to address the firm's "[mistaken] reliance on N.Y. Labor Law § 193 and § 198

in certain portions of the Prior Report," (Dkt. No. 26-8, at 5). The Jones Hacker Report lists five

conclusions:

> The [County Board], as a body, is vested with authority to fix or modify the compensation of County employees (with few exceptions). Without [County Board] approval, on March 15, 2020 the County Administrator announced the time-and-a-half plan to department heads, and the Human Resources (HR) Director reported it to representatives of the three unions. The County Administrator and the Human Resources Director made these announcements on March 15 before the [County Board] had deliberated or authorized any such pay increases.

> The five-member Covid-19 oversight group created by [County Board] Resolution 84 of 2020 was a "public body" within the meaning of the New York Open Meetings Law. Accordingly, its meetings should have been open to the public, and the group was required to keep contemporaneous minutes of its meetings. In fact, the meetings were held in private, and there are no minutes, or any other record, of business conducted during the meetings. This has contributed to uncertainty and controversy about when and how the group decided to end the time-and-a-half pay for most physically-present workers for the March 20–April 2 pay period.

> There has been significant criticism of County Administrator [Plaintiff] and HR Director Margaret McNamara for receiving time-and-a-half pay initially (for the week of March 16–19, which they reversed in subsequent payroll adjustments), while they were also members of the Covid oversight group responsible for deciding on compensation adjustments. Although it is not our province to tell the [County Board] whether that is wise or unwise policy, we do not see illegality in what transpired in that regard. . . . At least in [Plaintiff's] case—good policy or not—his initial receipt of extra pay (before reversing it) was actually consistent with what was disclosed to the [County Board] on March 17. . . .

> The Covid oversight group's decision to discontinue the time-and-a-half pay in the March 20–April 2 pay period for all employees except for 35 working in the Covid command center is very poorly documented. The group says it made the decision during a meeting on March 19, but there appears to be no contemporaneous documentation of the decision, and the first public notice of it did not materialize until March 31. . . .

> The County also altered course on time-and-a-half pay for department heads and deputy department heads for the week of March 16–19. Nearly all department heads and deputies received the extra pay for that week in their March 26 paychecks/deposits. Some members of the Covid oversight group subsequently reconsidered whether department heads and deputies should receive the extra pay, and decided to reverse it by making offsetting payroll deductions in the next paychecks of April 9. . . .

(Dkt. No. 26-22, ¶ 31; Dkt. No. 34, ¶ 31; Dkt. No. 26-8, at 6–8).

### D.      The Hinckley Letter

Shortly after the Jones Hacker Report was issued on August 6, 2020, Plaintiff's then-counsel, Hinckley Allen, sent the County and County Board a "litigation hold" letter (the "Hinckley Letter"). (Dkt. No. 26-22, ¶ 33; Dkt. No. 34, ¶ 33; Dkt. No. 26-11, at 12–13). The Hinckley Letter states, in part, that Plaintiff "has been advised that the [County Board] intends to take adverse employment action against him, including potential termination of his employment, on the basis of the Jones Hacker Report and the negative publicity the [County] Board has received concerning compensation to County employees during the unprecedented COVID-19 pandemic." (Dkt. No. 26-22, ¶ 34; Dkt. No. 34, ¶ 34; Dkt. No. 26-11, at 13). The Hinckley Letter continues, "[Plaintiff] would like to discuss the issues of concern that seem to be driving the [County] Board's intention to terminate him, and amicably resolve whatever differences exist. . . . [Plaintiff] intends to pursue all available rights and remedies afforded to him under, and to the full extent, of the law if he is terminated by the [County] Board." (Dkt. No. 26-22, ¶ 34; Dkt. No. 34, ¶ 34; Dkt. No. 26-11, at 13).

### E.      The August 18, 2020 County Board Meeting

The County Board held a meeting on August 18, 2020. At this meeting, the Hinckley Letter was published to the County Board. (Dkt. No. 26-22, ¶ 33; Dkt. No. 34, ¶ 33; Dkt. No. 26-11, at 12–13). Defendant Mr. Kusnierz then introduced a resolution calling for Plaintiff's termination as County Administrator. (Dkt. No. 33, ¶ 47; Dkt. No. 38, ¶ 47; Dkt. No. 40, ¶ 47; *see also* Dkt. No. 26-11, at 25 (Minutes from August 18, 2020 County Board meeting indicating that "Mr. Kusnierz said Mr. Chairman. He'd like to offer a resolution rescinding the at will appointment of the County Administrator [Plaintiff] effective immediately and move for its adoption.")). Defendant Mr. Kusnierz did not publicly provide a rationale for doing so, (Dkt. No.

33, ¶ 48; Dkt. No. 38, ¶ 48; Dkt. No. 40, ¶ 48), and minutes from the August 18, 2020 meeting

reveal that Defendant Mr. Kusnierz received immediate pushback from other Supervisors:

> Mr. Lawler suggested that this motion is inappropriate given the fact that it is without a doubt the most severe action that this Board can possibly take. There has been no discussion of this action at any committee meetings. This motion has not come before Law & Finance as motions traditionally do. Given the fact also that no supervisor has had a chance to consider which I would hope if this resolution goes forward what grounds for the termination would be and no one has had an opportunity to consider that. He thinks this motion is inappropriate for this meeting simply because it has not been discussed as a normal motion would. This motion is much more serious with, what he thinks disastrous consequences for the County and he thinks it would be more appropriate if the Board had an opportunity to consider this motion as the Board would any other motion that would come before us.

(Dkt. No. 26-11, at 26).

> Mr. Lawler said one other thing, please. He is really disappointed in a sense that we are about to consider a motion, and obviously the votes are there to put this on the agenda. He thinks that is a forgone conclusion. We are about to consider a motion to terminate a county employee, 32 years, he has served this County with great distinction. Admirably to serve this County. 32 years of service. We are going to consider a motion without any chance for him to even know why he's being terminated. No opportunity to defend himself. No opportunity to be aware of why this motion is on the floor. I think it is the height of injustice to a 32-year employee to terminate him without even so much as a conversation and an opportunity for him to defend himself. This motion will go forward and all probability [Plaintiff] will be terminated today. We heard earlier from his attorney that an action like that would be arbitrary and capricious. And he thinks moving forward without an opportunity for him to defend himself, to step outside of the County's discipline process is in fact the definition of arbitrary and capricious. Let's move forward and let's prepare the County for a lawsuit over what is a political vendetta.

(*Id.* at 27). One Supervisor referenced an effort to "squash or silence" a pending report:

> Mr. Peck said a few things he wanted to touch on. . . . [S]everal months ago an unlawful workplace harassment case was filed by one of the members, against one of the members. An outside investigation been going on that for months. Cause now it looks more like after I've had these conversation they are going after [Plaintiff], the Administrator, they want the Human Resource Director who is on a term removed and now they are going after the County Attorney. Now it looks like the purpose is to squash or silence the pending report cause those are the people that know about it. This is a bigger issue for the folks that work in this county to understand. This is a bigger issue for folks that work for this County and the citizens

of the County to find out what is really going on here. He said he has tracked and
tried to participate and assist this County in any way he could throughout. He kept
getting reports of interference with our unions, our members of this organization.

(*Id.* at 34).

Defendant Mr. Kusnierz removed the resolution calling for Plaintiff's termination. (Dkt.

No. 33, ¶ 49; Dkt. No. 38, ¶ 49; Dkt. No. 40, ¶ 49). Instead, the County Board passed a different

resolution to form a committee of seven Supervisors (the "External Committee") to examine the

findings laid out in the Jones Hacker Report and, "with the assistance of the County's labor

counsel, Goldberg Segalla[,] to receive recommendations from said labor counsel as to what, if

any, disciplinary action may be appropriate against any employee named in the report." (Dkt.

No. 26-22, ¶ 39; Dkt. No. 34, ¶ 39; Dkt. No. 26-11, at 47).

Supervisor Willard Peck testified at his deposition that at the August 18, 2020 meeting

Defendant Mr. Kusnierz told him, "They are going after me, so I'm going after them." (Dkt. No.

30-2, at 108:22–23).

F.     **The External Committee Investigation**

On December 13, 2020, the External Committee submitted to the County Board a report

(the "External Committee Report") summarizing several determinations made in the Jones

Hacker Report:

> [Plaintiff] informed County staff that workers who showed up "in person" would
> be paid time and a half before the [County Board] discussed and voted to form the
> COVID-19 Oversight Group (Resolution 84-2020);
>
> [Plaintiff] presented incorrect information to the [County Board] regarding other
> local municipalities paying time and a half to "in person" essential workers;
>
> [Plaintiff had not been compliant] with [New York's] Open Meetings Law; and
>
> [Plaintiff] failed to communicate effectively with the [County Board, labor unions
> and non-unionized employees] when the time and a half plan would end.

10

(Dkt. No. 26-12, 2–3). The External Committee Report recommends suspending Plaintiff for two weeks without pay and requiring him to complete "a curated list of courses on the LinkedIn Learning web-based platform equaling roughly 31 hours." (*Id.* at 8). Based on the External Committee's findings, the County Board issued to Plaintiff a confidential counseling memorandum recommending "that he improve his skills in communicating in a crisis, leadership in a crisis, solving problems and remote collaboration." (Dkt. No. 26-22, ¶¶ 42–43; Dkt. No. 34, ¶¶ 42–43).

### G. The January 6, 2021 County Board Meeting

The County Board held another meeting on January 6, 2021, the day Defendant Mr. Kusnierz was elected Chairman. (Dkt. No. 26-22, ¶ 3; Dkt. No. 34, ¶ 3). At this meeting, Supervisor Joseph Grasso introduced Resolution 2021-4 appointing Steven J. Bulger as County Administrator. (Dkt. No. 26-7, at 2). The meeting minutes reflect that several Supervisors protested:

> As Mr. Peck and Mr. Zlotnick just said, has no one in the room [sic] the courage to stand up and say that they are the architect for firing a 33 year employee without so much as telling him why. He is wondering if anyone had the courtesy or decency to tell [Plaintiff] he was fired effective January 5th. Did anyone have that decency; he is guessing no. Here we have people who are ready to vote on a resolution that no one will admit they wrote; it's that embarrassing. He asked who conducted the interviews for this position, who met with Mr. Bulger, who met with other candidates if there were others, who negotiated with Mr. Bulger, and on what authority. If we are going to replace the County Administrator, the most important position in County government, why was there no search done. If you're that set on getting rid of [Plaintiff], even though no one will put their hand up and take responsibility, why was there no search done. What a disgrace and disservice to the taxpayers of this County that no search was done to replace the most important person.

(*Id.* at 3).

> Mr. Pemrick said the discussion has gotten off track again. The question was how this resolution came about, who proposed it, who said what to whom, whose idea was it, and we have determined counsel wrote the resolution. We don't know at whose direction. His concern goes back to one of the initial goals that was

mentioned during the Chairman's remarks about transparency. He said within an hour it seems to have gone array in terms of the direction of perception of this Board. It doesn't have to be that way. We need someone to step up and explain. The longer someone remains silent the deeper the wound becomes.

Mr. Allen said he's having a hard time understanding the reason we are letting [Plaintiff] go without any justification or reasoning. And asking him to vote on someone he hasn't even seen a resume on and asked if he was even qualified. Does anyone know. He thinks the Board is going down the wrong road.

(*Id.* at 4).

After some discussion, the resolution appointing Mr. Bulger as County Administrator proceeded to a vote. (*Id.* at 4). Nine Supervisors, including Defendant Mr. Kusnierz, voted in favor of the resolution, while twelve Supervisors voted against it and two abstained. (*Id.*). However, the nine Supervisors who voted in favor of the resolution controlled 134,625 weighted votes, compared to the 73,992 weighted votes controlled by the twelve Supervisors who voted against it. (*Id.*). Thus, the resolution passed. (*Id.*). The following day, Plaintiff submitted to the County a letter of retirement. (Dkt. No. 26-22, ¶ 16; Dkt. No. 34, ¶ 16).

### H. Subsequent Proceedings

On April 6, 2021, Plaintiff filed a Notice of Claim under New York General Municipal Law § 50-e, against the County, County Board, and nine individual Supervisors. (Dkt. No. 26-22, ¶ 48; Dkt. No. 34, ¶ 48). Plaintiff alleged various theories of recovery but did not allege that he was terminated because of his participation in the BSK Investigation or as a result of his support for Ms. McNamara. (Dkt. No. 26-22, ¶ 49; Dkt. No. 34, ¶ 49). A New York General Municipal Law § 50-e hearing was held on July 19, 2021. (Dkt. No. 26-22, ¶ 50; Dkt. No. 34, ¶ 50). Plaintiff did not file a lawsuit based on his Notice of Claim. (Dkt. No. 26-22, ¶ 51; Dkt. No. 34, ¶ 51).

On June 17, 2021, Plaintiff brought an Article 78 proceeding against the County and County Board disputing the decision to replace him with Mr. Bulger. (Dkt. No. 26-22, ¶ 44; Dkt.

No. 34, ¶ 44). Plaintiff argued that the County and County Board did not "have unfettered discretion" and that "he could not be terminated in bad faith or for improper or impermissible reasons." (Dkt. No. 26-22, ¶ 45; Dkt. No. 34, ¶ 45). He asserted that the County Board "acted in bad faith with improper motives by 'scapegoating' him for an unpopular decision by the [County Board]" to increase compensation for essential employees during the COVID-19 pandemic. (Dkt. No. 26-22, ¶ 45; Dkt. No. 34, ¶ 45). Plaintiff's petition was dismissed on February 8, 2022: the court found that he "served at the pleasure of the [County Board]" and that he was an "at-will employee who could be terminated at any time for any reason or for no reason." (Dkt. No. 26-22, ¶ 46; Dkt. No. 34, ¶ 46). Plaintiff did not appeal this decision. (Dkt. No. 26-22, ¶ 47; Dkt. No. 34, ¶ 47).

## III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV. DISCUSSION

Plaintiff brings the following claims: (1) Title VII claims against the County Defendants for retaliation (First Cause of Action); (2) NYSHRL claims against the County Defendants for retaliation (Second Cause of Action); (3) a § 1983 claim against Defendant Mr. Kusnierz for retaliation (Third Cause of Action); and (4) an NYSHRL claim against Defendant Mr. Kusnierz for aiding and abetting (Fourth Cause of Action). (*Id.*). Defendants move for summary judgment

and seek dismissal of Plaintiff's claims in their entirety. (Dkt. No. 26-21, at 6; Dkt. No. 27-4, at 4). Plaintiff opposes Defendants' motions. (Dkt. Nos. 31–32).

A.    **Retaliation – Title VII & NYSHRL**

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The NYSHRL similarly makes it unlawful for an employer to retaliate or discriminate against an employee because "he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7). Both Title VII and NYSHRL retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73–74 (2d Cir. 2015) (Title VII); *Mittl v. N. Y. State Div. of Human Rts.*, 100 N.Y.2d 326, 330 (2003) (NYSHRL).

Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by showing evidence that: (1) he engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action. *Id.* at 129. If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

15

### 1.      Prima Facie Case

The County Defendants do not challenge the first three elements of Plaintiff's prima facie case. (*See* Dkt. No. 26-21, at 11). Indeed, it appears Plaintiff engaged in protected activity by publicly supporting Ms. McNamara's complaint against Defendant Mr. Kusnierz and participating in the BSK Investigation, (Dkt. No. 33, ¶ 38; Dkt. No. 38, ¶ 38; Dkt. No. 40, ¶ 38), and that Defendants were aware of this activity, (Dkt. No. 33, ¶¶ 39–43; Dkt. No. 38, ¶¶ 39–43; Dkt. No. 40, ¶¶ 39–43). *See Hubbard v. Total Communs. Inc.*, 347 F. App'x 679, 680–81 (2d. Cir. 2009) (summary order) ("'Protected activity' includes opposition to a discriminatory employment practice or participation in any investigation, proceeding, or hearing under Title VII" and "a plaintiff . . . need not prove that the conditions she protested amounted to an actual Title VII violation; she need only establish that she had a good faith, reasonable belief that a violation occurred." (first citing 42 U.S.C. § 2000e-3(a), and then citing *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999))). It also appears that the County Defendants took an adverse employment action against Plaintiff by replacing him as County Administrator. (Dkt. No. 33, ¶ 62; Dkt. No. 38, ¶ 62; Dkt. No. 40, ¶ 62). Instead, the County Defendants focus on the fourth element, arguing that Plaintiff's retaliation claims are subject to summary judgment because "Plaintiff cannot show that a 'causal connection' existed between his alleged protected activity and the [County] Board's decision to replace him with Mr. Bulger." (Dkt. No. 26-21, at 11).

The Court is not persuaded. Plaintiff has introduced evidence from which a jury could infer retaliatory animus and a causal connection with respect to the decision to replace Plaintiff as County Administrator. Plaintiff encouraged Ms. McNamara to file a formal sexual harassment complaint against Defendant Mr. Kusnierz, (Dkt. No. 30, ¶¶ 22–23; Dkt. No. 38, ¶¶ 22–23; Dkt. No. 40, ¶¶ 22–23), and approved the minor contract to hire BSK to conduct the BSK

Investigation, (Dkt. No. 30, ¶ 27; Dkt. No. 38, ¶ 27; Dkt. No. 40, ¶ 27). Plaintiff denied

Defendant Mr. Kusnierz's request for the County to pay the legal fees he incurred as a result of

the complaint. (Dkt. No. 30, ¶¶ 28–29; Dkt. No. 38, ¶¶ 28–29; Dkt. No. 40, ¶¶ 28–29). And

Plaintiff stated during his June 15, 2020 interview with BSK that Defendant Mr. Kusnierz

discriminated against Ms. McNamara based on her gender. (Dkt. No. 33, ¶ 41; Dkt. No. 38, ¶ 41;

Dkt. No. 40, ¶ 41). Defendant Mr. Kusnierz received a copy of the complaint, which lists

Plaintiff as a witness, (Dkt. No. 30, ¶ 25; Dkt. No. 38, ¶ 25; Dkt. No. 40, ¶ 25), as well as a copy

of the BSK Report, which includes a summary of Plaintiff's interview with BSK, (Dkt. No. 33, ¶

40; Dkt. No. 38, ¶ 40; Dkt. No. 40, ¶ 40).

At the August 18, 2020 meeting, approximately two months after Plaintiff's interview,

Defendant Mr. Kusnierz called for Plaintiff's termination, (Dkt. No. 33, ¶ 47; Dkt. No. 38, ¶ 47;

Dkt. No. 40, ¶ 47), without publicly providing a rationale, (Dkt. No. 33, ¶ 48; Dkt. No. 38, ¶ 48;

Dkt. No. 40, ¶ 48). Mr. Peck testified at his August 17, 2023 deposition that at the August 18,

2020 meeting Mr. Kusnierz told him, "They are going after me, so I'm going after them."[2] (Dkt.

No. 30-2, at 108:22–23). Mr. Peck also wrote in a January 7, 2021 email that "Kusnierz and

Barrett are reckless and vindictive" and "wanted to make it so uncomfortable that [Plaintiff]

would resign." (Dkt. No. 30-13, at 2). Mr. Kusnierz was elected Chairman of the County Board

on January 6, 2021, and on that same day the County Board enacted Resolution 2021-4,

---

[2] Defendant Mr. Kusnierz argues that this comment is insufficient to create an issue of fact because it was allegedly made on August 18, 2020, ten days before the BSK Report was completed. (Dkt. No. 37, at 6). But Ms. McNamara filed her complaint, which lists Plaintiff as a witness, (Dkt. No. 33, ¶ 24; Dkt. No. 38, ¶ 24; Dkt. No. 40, ¶ 24), on April 28, 2020, (Dkt. No. 26-22, ¶ 18; Dkt. No. 34, ¶ 18). And while Mr. Dorsey, the County Attorney, could not recall at his deposition exactly when he provided Defendant Mr. Kusnierz with a copy of the complaint, (Dkt. No. 30-1, at 33:22–23), it appears that he did so by mid-May 2020, as by then Defendant Mr. Kusnierz had, directly or through counsel, submitted a request for the County to pay the legal fees he would incur as a result of the complaint, (*id.* at 35:11–37:3).

replacing Plaintiff as County Administrator with Mr. Bulger. (Dkt. No. 26-22, ¶¶ 3, 13; Dkt. No. 34, ¶¶ 3, 13).

Construing all facts in the light most favorable to Plaintiff, the Court finds that, for Plaintiff's prima facie case, there is sufficient temporal proximity between Plaintiff's support for Ms. McNamara and participation in the BSK Investigation, on the one hand, and the County Defendants' decision to replace him as County Administrator, on the other, to establish a causal nexus. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (holding that temporal proximity of four months "is sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."); *Summa*, 708 F.3d at 125 ("The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote."). As a result, the Court finds that Plaintiff has established a prima facie case of discrimination with respect to the County Defendants' decision to replace Plaintiff as County Administrator, and a presumption of discrimination arises.

### 2.      Legitimate Nondiscriminatory Reasons

The burden now shifts to the County Defendants to show a "legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802. The County Defendants' burden "is not a particularly steep hurdle." *Hyeck v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it

'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).

County Defendants have satisfied their burden here with evidence that the decision to replace Plaintiff as County Administrator was based on his job performance and a belief that Mr. Bulger was well-suited for the role. Phil Barrett, Supervisor for the Town of Clifton Park, explains in his January 16, 2024 affidavit that "one of the [Jones Hacker Report's] main conclusions was that [Plaintiff] and Ms. McNamara overstepped their authority in implementing the time and a half plan." (Dkt. No. 26-4, ¶ 33). Mr. Barrett states, "I was not at all happy about the time and a half plan, but because [Plaintiff] and Ms. McNamara had already represented to County employees that the County would pay time and a half, I felt the [County Board] had to honor it, at least temporarily." (*Id.* ¶ 43). "[Plaintiff's] announcement for the plan put us in a tough spot," Mr. Barrett continues, and the plan ultimately "proved so unpopular that it was rescinded." (*Id.* ¶¶ 46, 48). The findings in the Jones Hacker Report "demonstrate why I and others lost faith in [Plaintiff's] ability to perform his job," and "[Plaintiff] was well aware that the findings of the Jones Hacker Report . . . jeopardized his position as County Administrator." (*Id.* ¶¶ 48, 49).

Similar views are expressed by other Supervisors in their affidavits. Darren O'Connor, then-Supervisor for the Town of Malta, states, "I was concerned how [Plaintiff] handled the County's decision to pay time and a half for a brief period of time to certain County employees" and "I voted for the resolution appointing Mr. Bulger as County Administrator because I had lost faith in [Plaintiff's] abilities to continue that position." (Dkt. No. 26-16, ¶¶ 8–9). Kevin Tollisen, Supervisor for the Town of Halfmoon states, "I was very concerned with how [Plaintiff] handled the Covid time and a half pay issue" and "I voted for Mr. Bulger for that reason." (Dkt. No. 26-

18, ¶ 8). Matthew Veitch, Supervisor for the City of Saratoga Springs, adds that "I think the Covid pay issue was illustrative of a larger problem with [Plaintiff]: he had become increasingly dismissive of the [County Board's] input and had developed an almost autocratic style in administering the County." (Dkt. No. 26-19, ¶ 8). And John Lant, Supervisor for the Town of Wilton, notes that "I disagreed with how [Plaintiff] handled the Covid time and a half pay issue" and "I also thought that [Plaintiff] sometimes forgot that he served the [County Board], rather than the other way around." (Dkt. No. 26-20, ¶¶ 9–10). Joseph Grasso, who in 2021 was the newly elected Supervisor for the Town of Charlton, explains that the January 6, 2021 meeting was his first on the County Board and that "I had no idea that [Plaintiff] had participated in any investigation involving Ms. McNamara's harassment claims." (Dkt. No. 26-17, ¶¶ 1, 8–9). According to Mr. Grasso, "I voted for Mr. Bulger because I had personally known him for well over twenty years in a professional capacity" and "I thought he would be an outstanding fit for the County going forward." (*Id.*).

From the Hinckley Letter it appears that Plaintiff believed his job performance, as reflected in the Jones Hacker Report, might jeopardize his position as County Administrator. The letter, which was published at the August 18, 2020 meeting, (Dkt. No. 26-22, ¶ 33; Dkt. No. 34, ¶ 33; Dkt. No. 26-11, at 12–13), reads in part:

> [Plaintiff] has been advised that the [County Board] intends to take adverse employment action against him, including potential termination of his employment, on the basis of the Jones Hacker Report and the negative publicity the Board has received concerning compensation to County employees during the unprecedented COVID-19 pandemic. We request the opportunity to substantively and meaningfully respond to any concerns the [County] Board has regarding [Plaintiff's] conduct before it takes any employment action against him.

(Dkt. No. 26-22, ¶ 34; Dkt. No. 34, ¶ 34; Dkt. No. 26-11, at 13).

As a result, the Court finds that Defendants have offered a legitimate, nondiscriminatory reason for replacing Plaintiff as County Administrator and the "presumption of retaliation dissipates." *Ya-Chen Chen*, 805 F.3d at 70. The burden shifts back to Plaintiff to establish "that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (citation omitted).

### 3.    Pretext for Retaliation

At the third stage of the *McDonnell Douglas* burden-shifting analysis, "a plaintiff alleging retaliation must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 846–847 (2d Cir. 2013) (quoting *Nassar*, 570 U.S. at 348, 360). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. "[A] plaintiff may rely on evidence comprising [his] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* at 847. Pretext may be shown, inter alia, "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action. *Id.* at 846.

Here, the Court concludes that Plaintiff has adduced sufficient evidence from which a jury could find that the reason proffered by the County Defendants for replacing Plaintiff as County Administrator was not the true reason but was a pretext for retaliation. The County Defendants rely to a significant extent on Plaintiff's role in the time-and-a-half plan and have submitted affidavits from a number of Supervisors in which they state that their votes to appoint Mr. Bulger were based on dissatisfaction with Plaintiff's job performance and "had nothing to do with" Plaintiff's participation in the BSK Investigation or support for Ms. McNamara. (Dkt. No.

26-21, at 13). But the time-and-a-half plan was approved unanimously by the County Board.
(Dkt. No. 30-14, at 19). Defendant Mr. Kusnierz testified at his May 12, 2023 deposition that his
concerns regarding the plan were addressed before he voted to authorize it in March 2020. (Dkt.
No. 30-6, at 207:14–16). And Defendant Mr. Kusnierz has provided conflicting testimony about
why he voted to appoint Mr. Bulger as County Administrator in place of Plaintiff. (*Compare*
Dkt. No. 30-7, at 17:10–13 (testifying at his June 14, 2023 deposition that his vote was based
only on Mr. Bulger's qualifications) *with id.* at 48:21–49:8 (later testifying at the same
deposition that his vote was also "performance based.")).

   Additionally, while the County Board created an External Committee to examine the
findings concerning the time-and-a-half plan laid out in the Jones Hacker Report and recommend
appropriate disciplinary action against any employee named within it, (Dkt. No. 26-22, ¶ 39;
Dkt. No. 34, ¶ 39; Dkt. No. 26-11, at 47), the decision to replace Plaintiff as County
Administrator far exceeded the External Committee's recommendation that Plaintiff be
suspended for two weeks without pay and required to complete a series of online courses, (Dkt.
No. 26-12, at 8). Furthermore, to the extent the County Defendants argue that the decision to
replace Plaintiff reflects Mr. Bulger's abilities, apparent irregularities in the County
Administrator search and hiring process undermine this claim. (*See, e.g.*, Dkt. No. 26-7, at 3
(Minutes from January 6, 2021 County Board meeting reflecting that Mr. Lawler stated, "[h]ere
we have people who are ready to vote on a resolution that no one will admit they wrote. . . . He
asked who conducted the interviews for this position, who met with Mr. Bulger, who met with
other candidates if there were others, who negotiated with Mr. Bulger, and on what authority. If
we are going to replace the County Administrator, the most important position in County
government, why was there no search done[?] . . . [T]he [County] Board has not been given the

resume of Mr. Bulger. None of us knew about this appointment until the last four or five days.")).

Taking into account the indicia of retaliatory animus discussed above, the Court concludes that Plaintiff has introduced sufficient evidence that, if credited, would allow a reasonable factfinder to conclude that the legitimate, non-discriminatory reason proffered by the County Defendants is pretextual and that retaliation was a but-for cause of his termination. Accordingly, Defendants' motions for summary judgment are denied as to Plaintiff's Title VII claims against County Defendants for retaliation. Because "[c]laims of discrimination . . . under the NYSHRL are analyzed based on the same standard as claims under Title VII," *Powell v. Delta Airlines*, 145 F. Supp. 3d 189, 201 (E.D.N.Y. 2015); *see also Vargas v. Morgan Stanley*, 438 F. App'x 7, 9 (2d Cir. 2011) (summary order) (using the same standard to analyze Title VII and NYSHRL discrimination claims), including claims of retaliation,[3] *Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 295 (W.D.N.Y. 2014) ("Generally, the same analysis applies to retaliation claims made under the NYSHRL and Title VII."), Defendants' motions for summary judgment are also denied as to Plaintiff's NYSHRL claims against County Defendants for retaliation.

## B.    Retaliation – § 1983

Defendant Mr. Kusnierz moves for summary judgment dismissing Plaintiff's § 1983 retaliation claim.[4] (Dkt. No. 27-4, at 11).

---

[3] The parties agree that retaliation claims brought under the NYSHRL are subject to the same standards as retaliation claims brought under Title VII. (Dkt. No. 26-21, at 15; Dkt. No. 31, at 20). "[I]t is well-established that the substantive standards for liability under the NYSHRL and Title VII are coextensive: '[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.'" *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011)). However, there is one relevant difference—unlike Title VII, the NYSHRL allows for individual liability. *Rojas*, 660 F.3d at 107 n.10.

[4] Defendant Mr. Kusnierz argues that "Plaintiff cannot show selective treatment as required to establish violation of the equal protection clause." (Dkt. No. 27-4, at 11). However, as Plaintiff points out, the basis of his § 1983 claim is not selective treatment. (Dkt. No. 32, at 20). Therefore, Defendant Mr. Kusnierz's argument does not bear on the Court's analysis.

In the Second Circuit, "a claim for retaliation for a complaint that alleged discrimination is actionable under § 1983" because "retaliation is a form of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 81–82 (2d Cir. 2015). To establish a retaliation claim under § 1983, a plaintiff must demonstrate "a claim under the same standards applicable to a Title VII claim—and that the adverse action was taken by someone acting 'under color of state law.'" *Id.* at 88.

### 1.   Color of State Law

As an initial matter, the parties do not seem to dispute that Defendant Mr. Kusnierz was a state actor and is therefore a proper defendant for purposes of a § 1983 claim. Indeed, it appears Defendant Mr. Kusnierz was "[a] state employee acting in his official capacity" when, as a Supervisor on the County Board, he voted to replace Plaintiff as County Administrator. *Id.* at 88 (citing *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)).

### 2.   Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) the defendant was aware of the activity; (3) the defendant took an adverse employment action against him; and (4) there is a causal connection between the protected activity and the adverse action. *Summa*, 708 F.3d at 125. A plaintiff must also show that the retaliation was a but-for cause of the adverse action. *Keles v. Davalos*, 642 F. Supp. 3d 339, 372 (S.D.N.Y. 2022). Again, Defendant Mr. Kusnierz does not challenge the first three elements of Plaintiff's prima facie case, focusing instead on the fourth element and arguing that Plaintiff cannot show the requisite causation. (Dkt. No. 27-4, at 12).

Given the evidence of close temporal proximity between Plaintiff's support for Ms. McNamara and participation in the BSK Investigation, on the one hand, and Defendant Mr. Kusnierz's vote to replace him as County Administrator, on the other, Plaintiff has established a

causal connection. Moreover, an even closer temporal proximity—approximately two months—exists between Plaintiff's June 15, 2020 interview with BSK and the August 18, 2020 meeting at which Defendant Mr. Kusnierz's first called for Plaintiff's termination, (Dkt. No. 33, ¶ 47; Dkt. No. 38, ¶ 47; Dkt. No. 40, ¶ 47), without publicly providing a rationale, (Dkt. No. 33, ¶ 48; Dkt. No. 38, ¶ 48; Dkt. No. 40, ¶ 48).

### 3.      Legitimate Nondiscriminatory Reasons

Here, as discussed previously, Defendants, including Defendant Mr. Kusnierz, have adduced evidence of a legitimate, nondiscriminatory reason for replacing Plaintiff as County Administrator. Specifically, Defendants have presented evidence that the decision to replace Plaintiff as County Administrator was based on his job performance and a belief that Mr. Bulger was well-suited for the role.

### 4.      Pretext for Retaliation

For the reasons set forth above, Plaintiff has presented sufficient evidence that Defendant Mr. Kusnierz's stated reason for replacing Plaintiff as County Administrator is not the true reason but was a pretext for retaliation. Defendant Mr. Kusnierz repeatedly cites Plaintiff's poor performance as County Administrator, focusing on his role in the time-and-a-half plan, as a reason for replacing him, but Defendant Mr. Kusnierz has also provided conflicting testimony that his vote to replace Plaintiff was based only on Mr. Bulger's qualifications. (Dkt. No. 30-7, at 17:10–13); *see Kwan*, 737 F.3d at 846 (holding that pretext may be shown, inter alia, "by demonstrating . . . inconsistencies[] or contradictions in the employer's proffered legitimate" nondiscriminatory reasons for its action). Defendant Mr. Kusnierz also allegedly told Mr. Peck, "They are going after me, so I'm going after them." (Dkt. No. 30-2, at 108:22–23). Thus, the Court agrees with Plaintiff's assessment that "a reasonable jury could find that but for

[Plaintiff's] having participated in the investigation against Defendant [Mr.] Kusnierz, he would not have been replaced." (Dkt. No. 32, at 23).

### 5.    Qualified Immunity

Defendant Mr. Kusnierz argues that he is entitled to qualified immunity because his actions in voting for Mr. Bulger to replace Plaintiff as County Administrator, "and any actions leading up to the vote, were objectively reasonable considering Plaintiff's history of poor performance in the role." (Dkt. No. 27-4, at 14). Plaintiff responds that Defendant Mr. Kusnierz is not entitled to qualified immunity because "it was not objectively reasonable for him to believe that [Plaintiff's] rights would not be violated given his actions." (Dkt. No. 32, at 24).

Qualified immunity "is an affirmative defense on which [Defendants have] the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). At the summary judgment stage, claims of qualified immunity are evaluated "using a two-part inquiry: (1) 'whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a federal right' and (2) 'whether the right in question was clearly established at the time of the violation.'" *Sloley v. Vanbramer*, 945 F.3d 30, 36 (2d Cir. 2019) (quoting *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)). The Court has discretion to decide which of the two prongs to address first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Under either prong of the qualified immunity analysis, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 572 U.S. at 656.

Here, there are material issues of fact as to whether Defendant Mr. Kusnierz's stated reason for replacing Plaintiff as County Administrator was a pretext for retaliation. Since factual issues remain that bear on the qualified immunity analysis, qualified immunity is precluded at this stage. *Taravella v. Town of Wolcott*, 599 F.3d 129, 135 (2d Cir. 2010) ("Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law

may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004))); *see also Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.").

Consequently, Defendants' motions for summary judgment are denied as to Plaintiff's § 1983 claim against Defendant Mr. Kusnierz for retaliation.

### C.    Aiding and Abetting – NYSHRL

Finally, Plaintiff brings an NYSHRL claim against Defendant Mr. Kusnierz for aiding and abetting the County Defendants in retaliating against him. (Dkt. No. 1, ¶¶ 96–100). Defendants move for summary judgment dismissing this claim. (Dkt. No. 26-21, at 15; Dkt. No. 27-4, at 7).

"By its terms, § 296(6) of the Human Rights Law creates a 'broad[ ] source of personal liability' that is not limited to employers or employees." *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011); *see also Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). In the Second Circuit, individuals can be held liable as aiders and abettors when they "actually participate[d] in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 (1998); *see also Oliver v. N.Y. State Police*, No. 15-cv-444, 2020 WL 1989180, at *51, 2020 U.S. Dist. LEXIS 73284, at *163–64 (N.D.N.Y. Apr. 27, 2020) ("A plaintiff seeking to bring an aiding and abetting claim for retaliation must demonstrate that individual defendants were involved, or participated in, retaliation following a plaintiff's complaint of discrimination." (citing *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 662

(E.D.N.Y. 2015)), *aff'd sub nom. Oliver v. D'Amico*, No. 22-cv-979, 2024 WL 2013670, 2024 U.S. App. LEXIS 11099 (2d Cir. May 7, 2024) (summary order).

Here, Plaintiff has adduced evidence, discussed throughout this opinion, that Defendant Mr. Kusnierz "actually participate[d]" in the decision to replace Plaintiff as County Administrator. *Feingold*, 366 F.3d at 158 (quoting *Tomka*, 66 F.3d at 1317). There is, therefore, evidence from which a factfinder could conclude that Defendant Mr. Kusnierz aided and abetted retaliation in connection with the decision. Accordingly, Defendants' motions for summary judgment are denied as to Plaintiff's NYSHRL claim against Defendant Mr. Kusnierz for aiding and abetting.

## V.    CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motions for summary judgment, (Dkt. Nos. 26–27), are **DENIED**.

**IT IS SO ORDERED.**

Dated:   August 13, 2024
          Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

28